# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>EDGAR MARTINEZ-PENA,<br>*aka* Pedro Fernandez-Reyes,<br><br>    Defendant. | No. CR09-4036-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

_____

On July 23, 2009, the defendant Edgar Martinez-Pena ("Martinez") was indicted by the grand jury in one count of aiding and abetting the possession of methamphetamine with intent to distribute. *See* Doc. No. 2. On August 17, 2009, Martinez filed a motion to suppress drug evidence seized from his vehicle. Doc. No. 17. The plaintiff (the "Government") resisted the motion on September 2, 2009. Doc. No. 28. Pursuant to the Trial Management Order, motions to suppress were assigned to the undersigned for the holding of any necessary evidentiary hearing, and the preparation of a report and recommended disposition of the motion. Doc. No. 13, § IV.A.

The undersigned held an evidentiary hearing on Martinez's motion on September 22, 2009. Martinez was present with his attorney, J. William Gallup. The Government was represented by Assistant United States Attorney Kevin Fletcher. The Government called four witnesses, to-wit: Chris Nissen and Robert Jones, both Special Agents with the Iowa Division of Narcotics Enforcement; Gregg Fox, a Special Agent with the United States Drug Enforcement Administration; and Iowa State Patrol Trooper Dan Miller.

The following exhibits were admitted into evidence, to-wit: **Gov't Ex. 1** - an application and warrant for installation of a tracking device (11 pages); **Gov't Ex. 2** - a DVD containing audio and video of a traffic stop that took place on January 26, 2009;

**Gov't Ex. 3** - a citation issued to Martinez (using the alias Pedro Fernandez Reyes) for driving without a valid license or permit (1 page); **Gov't Ex. 4** - a warning issued to Martinez (also under the alias) for speeding (1 page); **Gov't Ex. 5** - three photographs of the rear of a gold Jeep Cherokee vehicle, License Nol. 965 SSY; and **Gov't Ex. 6** - five photographs of the drugs found inside the Jeep.

The motion is now fully submitted and ready for consideration by the court.

## *BACKGROUND FACTS*

On January 23, 2009, AUSA Kevin Fletcher and DEA Special Agent Gregg Fox submitted an application to the undersigned for an order authorizing the surreptitious taking of and entry into a 2000 Jeep Cherokee vehicle, license number 965 SSY (the "Jeep"), for the purpose of installing an electronic tracking device. In the affidavit in support of the warrant application, Fox, relying on information provided to him by Iowa DNE Special Agent Chris Nissen, asserted there was probable cause to believe the Jeep was "being utilized to facilitate the trafficking and distribution of methamphetamine." Gov't Ex. 1, Affidavit in support of warrant application, ¶ 3. Fox further stated the Jeep commonly was operated by Martinez, and Martinez was "a main target of an ongoing investigation." *Id.*

Among other things, Fox indicated law enforcement officers had learned from a confidential information ("CI") that the CI had been purchasing methamphetamine from Martinez since sometime in 2006. The CI cooperated with officers in conducting a controlled purchase of methamphetamine from Martinez on December 31, 2008. *Id.*, ¶ 8. Officers wanted to install the tracking device to assist them in identifying co-conspirators, and locations where the organization purchased, concealed, and distributed drugs and drug proceeds. *Id.*, ¶ 10. The undersigned found probable cause to believe the Jeep was being used to facilitate the distribution of illegal drugs, and therefore the undersigned issued a warrant authorizing officers to do the following:

> a. Pursuant to 18 U.S.C. Section 3117, and Rule 41 Fed. R. Crim. P., within ten (10) calendar days of the date of the warrant, install and operate an electronic tracking device on the subject vehicle. The electronic tracking device may be operated and monitored continuously throughout the period of this order.
>
> b. Said officers or representatives of the Drug Enforcement Administration are authorized to surreptitiously take and enter the above-described subject vehicle for the explicit purpose of installing and removing said electronic tracking device, and to re-enter the subject vehicle at any time to make mechanical adjustments should the device be rendered inoperable.

Gov't Ex. 1, Warrant, p. 2. The Warrant further authorized its execution "at any hour of the day or night . . . without geographic limits." *Id.*

In the afternoon of January 26, 2009, Nissen and Iowa DNE Special Agent Robert Jones ("Bob Jones") met with several other officers at the Iowa State Patrol office in Denison, Iowa, to plan how they would obtain possession of the Jeep for purposes of installing the tracking device. Another Iowa DNE Special Agent, Todd Jones ("Todd Jones"), was doing surveillance at Martinez's residence in Denison, Iowa, where the Jeep was parked. The plan was for officers to maintain surveillance of the Jeep, and when it left the residence, to have Iowa State Patrol Trooper Dan Miller follow the Jeep and attempt to perform a traffic stop on the vehicle. Although the officers planned to stop the Jeep in any event, they hoped whoever was driving the vehicle would commit a traffic offense, which would give them a ruse to stop the Jeep. They knew Martinez usually drove the Jeep and he did not have a valid driver's license, so if they were able to stop the Jeep for a traffic violation, they would be able to impound the Jeep if it was being driven by Martinez. Then they would install the tracking device before releasing the Jeep from impound.

After maintaining surveillance for several hours, officers saw the Jeep leave the residence. They contacted Bob Jones who, in turn, contacted Miller to advise him of the

Jeep's location and direction of travel. Miller saw the Jeep, got behind it on the roadway, and immediately checked the Jeep's speed with his on-board radar. He found the Jeep was traveling 32 miles per hour in a 25-mile-per-hour zone. He pulled closer to the Jeep to read the license plate, and verified that the vehicle was the one that was of interest in the investigation.

Miller, who was in uniform and driving a marked patrol car, activated his emergency lights, which also activated the video recorder in his patrol car. The Jeep continued on for another block or two before coming to a stop at a stop sign. The Jeep's rear window was tinted, and from his patrol car, Miller could not see how many people were in the vehicle or what anyone was doing inside the vehicle. He got out of his patrol car and approached the driver's side of the Jeep. He observed the male driver, who appeared to be the vehicle's only occupant. Miller told the driver he had been stopped for going 32 miles per hour in a 25-mile-per-hour zone, and he asked for the driver's license and insurance verification. Miller shined his flashlight into the car to look for other occupants and weapons, but found neither. He also did not notice anything unusual in the floor in front of the driver's seat.

The driver produced an international driver's license bearing the name Pedro Fernandez Reyes, an alias Miller had been informed by Nissen that Martinez sometimes used. Miller stated it is his common practice to have a driver come to his patrol car during a traffic stop, and he asked the driver to come back and sit in his patrol car while he ran a check on the driver's license. The check indicated the driver's license was not valid. In addition, the type of license the driver produced is not valid unless it is accompanied by a passport, which the driver did not have. Miller told the driver he would be cited for driving without a valid license, and he also would be issued a warning for the speeding violation. *See* Gov't Exs. 3 & 4.

While Miller and the driver were sitting in the patrol car, Miller received a call from Bob Jones on his cell phone. Jones indicated the officers had the number of a cell

phone that had been used by Martinez to arrange drug transactions. Jones wanted to call the number and see if Miller could hear a cell phone ringing on the driver's person, so they could verify that the driver was, in fact, Martinez. Jones called the number and Miller heard a cell phone ringing. He concluded the driver who had identified himself as Pedro Fernandez Reyes actually was Martinez.

Miller told Martinez he would not be allowed to take the Jeep with him because he did not have a valid driver's license. Martinez called someone who came and picked him up at the scene. Miller called a tow truck, which towed the Jeep back to the State Patrol office in Denison, Iowa. After the tow truck dropped the Jeep off in the parking lot, Nissen got inside and drove the Jeep into the garage so the officers could install the tracking device. When Nissen got out of the Jeep, he did not mention to any other officer that he had noticed anything unusual in the floor in front of the driver's seat.

Once the vehicle was in the garage, several officers began working on the vehicle simultaneously. Miller and Todd Jones began doing an inventory of the Jeep's contents, while Nissen and another officer began removing the vehicle's windshield wipers. The officers planned to "hard wire" a GPS tracking device on the Jeep, which required them to remove the windshield wipers and then make some connections under the hood. When Nissen was ready to work under the hood of the Jeep, Bob Jones opened the driver's door to pop the hood release. Bob Jones testified as follows:

> Q     (By AUSA Fletcher) And at the office, at the office, tell us what happens when you get to the office, from then until the time the drugs were found.
>
> A     (By Bob Jones) Well, I got to the office, and I -- I went down to the garage, because it was decided that the Jeep was going to be towed to the garage of the State Patrol office. And I waited in the garage until it was – Special Agent Nissen drove the Jeep into the – into the garage.
>
> Q     Once the Jeep was driven into the garage, who's present and what happens?

| | | |
|---|---|---|
| A | | Who was present in the garage? |
| Q | | Who was present and then what happens? |
| A | | Myself, Trooper Miller, Special Agent Nissen, Agent Fox, Special Agent Todd Jones, and investigator Timmer. |
| Q | | Once the Jeep comes into the garage bay area and all of you are there, what do you see happen? |
| A | | Investigator Timmer and Agent Nissen began removing the windshield wipers. They had decided – they knew where they wanted to install the tracker, and the windshield wipers needed to be removed before anything else happened. Danny Miller, Trooper Miller, was in the garage, and he needed to inventory the vehicle for the tow report. So Special Agent Todd Jones and Trooper Miller were on the passenger's side in the front with the door open, just beginning the inventory. Special Agent Nissen and Investigator Timmer had, at that time, removed the windshield wipers and so I opened up the driver's side door to pop the – to hit the hood release so they could then access the engine compartment of the vehicle. |
| Q | | What happened? |
| A | | As soon as I opened up the door and reached in to pop the hood release, I saw what I recognized to be a large quantity of methamphetamine laying on the floorboard. |
| Q | | And that was all photographed, correct? |
| A | | Yes, it was. |
| Q | | And you've seen the photos? |
| A | | Yes, I have. |

Court's transcription of recording at time index 11:29:12-11:32:00. *See* Gov't Ex. 6.

Martinez argues the warrant did not authorize the officers to search the Jeep, but only to install the tracking device. He asserts the drugs were not in plain view; instead, as shown in the photographs, Bob Jones had to pull back the floor mat to see the drugs. Martinez argues this constituted an illegal warrantless search of the Jeep.

The Government argues the drugs were in plain view. Alternatively, the Government argues that even if Bob Jones did have to pull back the floor mat to see the

6

drugs, the officers had probable cause to conduct a warrantless search of the vehicle based on the information contained in the warrant application and the collective knowledge of the officers involved in the drug investigation. The Government further argues the drugs inevitably would have been discovered during the inventory search of the vehicle. Martinez counters that the officers had no evidence he was transporting drugs at the time of the traffic stop, and they did not have probable cause to search the Jeep.

## *DISCUSSION*

Preliminarily, the court finds the officers had the right to stop and seize the vehicle, both because of the traffic violation and pursuant to the warrant issued by the court. The fighting issues are, first, the factual issue of whether the drugs were in plain view; second, if they were not in plain view, whether the officers had the right to search the Jeep without a warrant; and third, if Bob Jones's actions violated Martinez's fourth amendment rights, whether the drugs inevitably would have been found during the inventory search of the vehicle.

The evidence offered by the Government establishes that the drugs were not in plain view. Neither Miller, when he looked inside the vehicle for weapons, nor Nissen, when he actually drove the vehicle, noticed the drugs in the driver's side floorboard. Although Bob Jones testified, "As soon as I opened up the door and reached in to pop the hood release, I saw what I recognized to be a large quantity of methamphetamine laying on the floorboard," the court finds this testimony not to be credible. It is contradicted by the testimony of Miller and Nissen that they did not see the drugs earlier. The only reasonable conclusion is that Bob Jones pulled back the floor mat and found the drugs. Therefore, the court finds the drugs were not in plain view and were found during a warrantless search. As a result, probable cause had to exist for a warrantless search of the Jeep to be valid.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The Fourth Amendment guarantee of the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures" is "preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer." *United States v. Caves*, 890 F. 2d 87, 89 (8th Cir. 1989) (citing *California v. Carney*, 471 U.S. 386, 390, 105 S. Ct. 2066, 2068-69, 85 L. Ed. 2d 406 (1985)). "The touchstone of the fourth Amendment's promise is 'reasonableness' which generally – though not always – translates into a warrant requirement." *United States v. Hatten*, 68 F.3d 257, 260 (8th Cir. 1995) (citations omitted).

"In certain circumstances, however, a search may comport with the fourth amendment reasonableness standard even though not conducted pursuant to a warrant. (Citation omitted). One such exemption to the warrant requirement is the so-called 'automobile exception,' which allows a police officer who has lawfully made a roadside stop of an automobile to search that vehicle without a warrant if probable cause exists to believe that contraband or evidence of criminal activity is located inside." *Caves*, 890 F.2d at 89 (citing *Chambers v. Maroney*, 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970), and *Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925)). The automobile exception is recognized because "[t]he mobility of automobiles . . . 'creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible'" and because "'the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.'"

*Carney*, 471 U.S. at 391, 105 S. Ct. at 2069 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 367, 96 S. Ct. 3092, 3096, 49 L. Ed. 2d 1000 (1976)).

The Government has the burden of establishing an exception to the Fourth Amendment's warrant requirement by a preponderance of the evidence. *See United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000); *United States v. Jaras*, 86 F.3d 383, 389 (5th Cir. 1996). "It is well established that warrantless searches violate the Fourth Amendment unless they fall within a specific exception to the warrant requirement[.]" *Jaras*, 86 F.3d at 388 (citing *United States v. Karo,* 468 U.S. 705, 717, 104 S. Ct. 3296, 3304, 82 L. Ed. 2d 530 (1984)). Probable cause for an automobile search exists if the facts and circumstances known by the police when they begin the search are sufficient in themselves for a person of reasonable caution to believe that contraband or evidence of criminal activity was in the vehicle. *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993) (quotations and citations omitted). The collective knowledge of all law enforcement officers involved in an investigation may form the basis for probable cause to conduct a warrantless search. *Id.; see also United States v. Rich*, 795 F.2d 680, 682 (8th Cir. 1986) ("[T]he court does not merely look to the actual knowledge of the arresting officer, but to the combined knowledge of all the officers involved.").

In *United States v. Ross*, 456 U.S. 798, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982), the Court clarified the automobile exception announced in *Carroll*. The *Ross* Court addressed "the extent to which police officers—who have legitimately stopped an automobile and who have probable cause to believe that contraband is concealed somewhere within it—may conduct a probing search of compartments and containers within the vehicle whose contents are not in plain view." *Ross*, 456 U.S. at 800, 102 S. Ct. at 2160. The Court held that the police "may conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant 'particularly describing the place to be searched.'" *Id.* (quoting U.S. Const. amend. 4).

9

Thus, the question in the present case becomes whether the officers' collective knowledge of the ongoing drug investigation and Martinez's past activities provided probable cause to believe contraband was concealed somewhere in the Jeep at the time it was seized on January 26, 2009. The court finds it did not. This was not a situation where the officers had arranged to buy drugs from Martinez, or knew Martinez would be delivering drugs to someone. Martinez simply got in the Jeep and left his residence. He could have been going anywhere. No officer testified that Martinez was carrying a package or bag that might have contained drugs. The knowledge that Martinez was the subject of an ongoing drug investigation and had been in possession of drugs in the past was not sufficient to provide probable cause to believe he had drugs concealed in his vehicle at the time it was seized.

These circumstances are different from, for example, those in *United States v. Harwood*, 998 F.2d 91 (2d Cir. 1993). In *Harwood*, a government agent approached the defendant at a campground to purchase some LSD. Harwood stated he did not have any LSD on him, but he had some in his van which his friend was loading in preparation for their departure. He went to the parking lot, returned with the LSD, sold several hits to the agent and then headed back to the parking lot with the remaining hits. Government agents, having developed probable cause to believe that the drug-selling defendant was keeping his wares in the van, arrested the defendant and others as they were driving away. Several hours later, after interviewing the defendants, the agents conducted a warrantless search of the van and discovered drugs. In affirming the trial court's decision to admit the evidence seized during the warrantless search, the Second Circuit Court of Appeals concluded that the agents had probable cause to believe that the van contained contraband and therefore the warrantless search did not violate the defendants' Fourth Amendment rights. *Harwood*, 998 F.2d at 97. Here, there was no evidence that Martinez was concealing drugs in the vehicle. The court finds the warrantless search of the vehicle violated Martinez's rights under the Fourth Amendment.

A question remains, however, regarding whether the drugs would have been discovered inevitably during the officers' inventory search of the vehicle. The doctrine of "inevitable discovery" allows for the admission of illegally seized evidence if the government meets certain conditions. "To succeed under the inevitable-discovery exception to the exclusionary rule, the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Connor*, 127 F.3d 663, 667 (8th Cir. 1997) (citation omitted). *But see United States v. Thomas*, 524 F.3d 855, 861-62 (8th Cir. 2008) (Colloton, C.J., concurring) (arguing the "reasonable probability" standard is over-inclusive under applicable Supreme Court precedent).

The Government meets the second prong of the *Connor* test easily. The reason for seizing the vehicle was to install a tracking device to further an ongoing investigation into drug trafficking activities. Thus, the Government clearly was "actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation."

The first prong of the test is more problematic. The only evidence at the suppression hearing regarding the location of the drugs was from Bob Jones, who testified he saw the methamphetamine as soon as he opened the driver's side door. The court has found this evidence not to be credible, both from the photographs and from the fact that both of the other officers who had a reasonable opportunity to do so failed to notice anything in the driver's side floorboard. Nevertheless, it also seems reasonable that during a thorough inventory search of the vehicle, Todd Jones and Miller would have checked underneath the seats for items that should be placed on the inventory list. The court therefore finds that inevitable discovery of the illegally-seized evidence during the inventory search was "more likely than not." *See Bourjaily v. United States*, 483 U.S.

171, 176, 107 S. Ct. 2775, 2779, 97 L. Ed. 2d 144 (1987); *see also Thomas*, 524 F.3d at 861-62 (Colloton, C.J., concurring).  As a result, the drugs need not be suppressed.

## *CONCLUSION*

For the reasons discussed above, IT IS RESPECTFULLY RECOMMENDED that Matinez's motion to suppress be **denied**.  Objections to this Report and Recommendation must be filed **by September 30, 2009**.  Responses to objections must be filed by **October 5, 2009**.

IMPORTANT NOTE:  Any party planning to lodge an objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **September 25, 2009, regardless of whether the party believes a transcript is necessary to argue the objection**.  If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 23rd day of September, 2009.

_____
PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT